FILED

13 DEC 17  AM 10: 43

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

D76

DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

TRACY HOLT,

Plaintiff,

vs.

MACARTHUR, *Registered Nurse*;
CALDERON, *Registered Nurse*;
STEWART, *Registered Nurse*; HUNT,
*Medical Doctor*; SEELY, *Medical
Doctor*; and, CANLAS, *Medical
Doctor*

Defendant.

CASE NO. 11cv1502-GPC(KSC)

**REPORT AND
RECOMMENDATION TO GRANT
DEFENDANTS' MOTION TO
ENFORCE SETTLEMENT**

[Doc. No. 69]

Presently before the Court is defendants' July 31, 2013 *ex parte* Motion to Enforce Settlement. [Doc. No. 69] On August 19, 2013, plaintiff filed an Opposition [Doc. No. 70], to which defendant timely filed a Reply [Doc. No. 72]. On October 21, 2013, plaintiff submitted a letter to the Court[1] seeking additional argument on the issue. [Doc. No. 74]  After reviewing the moving and opposing papers, and for the reasons articulated below, this Court **RECOMMENDS** that defendants' Motion to Enforce Settlement [Doc. No. 69] be **GRANTED**.

---

[1] Despite constituting an improper communication with the Court, the Court accepted the letter for filing. [Doc. No. 73]

# I. BACKGROUND

Tracy Holt ("plaintiff"), a state prisoner proceeding *pro se* and *in forma pauperis*, filed this civil rights action pursuant to 42 U.S.C. § 1983. [Doc. No. 1] Plaintiff claims that while incarcerated at Richard J. Donovan Correctional Facility in San Diego, California, defendants, various prison medical professionals, have been deliberately indifferent to his medical needs in violation of the Eighth Amendment. Specifically, plaintiff claims the named defendants have improperly "den[ied] him effective pain medication for his [back] pain" and have improperly "refus[ed] to give him the surgery needed to correct [the] problem." [Doc. No. 22, p. 5]

On December 12, 2011, defendants filed an Answer to plaintiff's Complaint and Supplemental Complaint. [Doc. No. 28] Shortly thereafter, the Court issued an Order scheduling a Case Management Conference ("CMC") for January 18, 2012. [Doc. No. 29] On January 18, 2012, the Court held a telephonic CMC to discuss discovery and other pre-trial proceedings. [Doc. No. 35]  In preparation for the CMC, the parties submitted case management briefs. [Doc. No. 34 (plaintiff's brief)] On January 19, 2012, the Court issued a Scheduling Order regulating discovery and other pre-trial proceedings ("Scheduling Order"). [Doc. No. 36]

On June 28, 2012, a telephonic Mandatory Settlement Conference ("MSC") was held. [Doc. No. 54] While the case did not settle, progress was made and the Court indicated that the parties were going to "continue talks." *Id.* The Court set a further MSC and ordered the parties to lodge with the Court more targeted briefing regarding certain medical records, treatment plans, and witness identities. [Doc. No. 55]  On August 27, 2012, a further telephonic MSC was held. [Doc. No. 58] Appearing at the MSC was plaintiff, Tracy Holt, and defense counsel, Martin Kosla.  The case settled. [Doc. No. 58] In exchange for plaintiff's dismissal of all claims, defendants agreed to pay plaintiff $450. The Court ordered defense counsel to prepare a draft of the Settlement Agreement, as well as a draft of the Joint Motion to Dismiss the action, and to send the documents to plaintiff. *Id.*

1    Attached to a letter dated September 25, 2012, defense counsel submitted to
2    plaintiff a (1) Settlement Agreement and Release; (2) a Voluntary Stipulation to
3    Dismiss; and, (3) a Payee Data Record form. [Doc. No. 69-1 (Declaration of Martin
4    Kosla), p. 2, 6] The letter asked plaintiff to review the three documents, to complete,
5    sign, and date where indicated, and to promptly return the items to defense counsel's
6    office. *Id.* at 6.  Because plaintiff indicated his desire for the settlement proceeds to be
7    paid directly to his father, defense counsel included in the settlement documents a
8    "Payee Data Record" form to facilitate that process. *Id.*

9    The first draft of the written Settlement Agreement states: "The sum of $450 will
10   be provided to plaintiff upon the subscription of plaintiff to this settlement agreement
11   and release of all claims, the attached stipulation of voluntary dismissal, and the
12   completion of the payee data form." [Doc. No. 69-1, p. 8, ¶ 1] The Settlement
13   Agreement further provided that, pursuant to state statute, all restitution obligations
14   would be taken out of the settlement proceeds before the final settlement check would
15   be issued.  Specifically, paragraph 3 of the Agreement states, "Pursuant to [California]
16   Penal Code Section 2085.5, all restitution obligations will be taken out of the proceeds
17   of the settlement before the final settlement check is drafted. The remainder of funds
18   after payment of restitution will be payable to plaintiff's father Jim Holt." [Doc. No.
19   69-1, p. 8] In early October 2012, defense counsel received from plaintiff a signed (1)
20   Settlement Agreement; (2) Voluntary Stipulation to Dismiss; and, (3) Payee Data
21   Record form.  The signed Settlement Agreement was dated September 29, 2012. [Doc.
22   No. 69-1, p. 17]

23   However, upon closer review of the documents submitted by plaintiff, defense
24   counsel realized that plaintiff, not his father, completed the Payee Data Record form.
25   In a letter dated October 25, 2012, defense counsel submitted to plaintiff a new Payee
26   Data Record form and explained that "[i]f [plaintiff] want[s] the settlement check to go
27   to [his] father, [his father] will need to sign the Payee Data Form and he will need to
28   provide his social security number." [Doc. No. 69-1, p. 23] Further, defense counsel

explained that he enclosed a new Payee form as well as a revised Settlement Agreement for plaintiff's signature adding language relating to the signing of the Payee Data Form. *Id.* Specifically, the only language revised in the second draft of the Agreement states, "The sum of $450 will be provided to plaintiff's father Jim Holt upon the subscription of plaintiff to this settlement agreement and release of all claims, the attached stipulation of voluntary dismissal, and the completion of a payee date form by plaintiff's father. If plaintiff fails to provide a payee data form fully completed and signed by his father, then the settlement funds will be deposited into plaintiff's prison trust account." [Doc. No. 69-1, p. 25, ¶¶ 1-2] However, the clause regarding the statutorily mandated payment of restitution previously included in the first draft of the Settlement Agreement was omitted from the second draft. [Doc. No. 69-1, p. 8] *cf.* [Doc. No. 69-1, p. 25]

On October 26, 2012, the Court held a telephonic Settlement Disposition Conference ("SDC"). [Doc. No. 59] At that conference the parties represented that they needed additional time to execute the appropriate paper work, specifically the Payee Data Record form by plaintiff's father. Good cause appearing, the Court set a further telephonic SDC for January 11, 2013. [Doc. No. 59]

In November 2012, defense counsel received from plaintiff a signed revised Agreement, dated November 16, 2012 by plaintiff. [Doc. No. 69-1, p. 34] This was in turn signed by defendants on November 26, 2012. *Id.* This constituted the second draft of the Agreement. However, plaintiff again failed to submit a completed Payee Data Record form. In a letter dated November 30, 2012, defense counsel again explained to plaintiff that in order for the CDCR to issue the settlement check to plaintiff's father instead of plaintiff, his father must sign and complete the form. [Doc. No. 69-1, p. 30] In December 2012, defense counsel received a competed Payee Data Record form, properly signed and executed by plaintiff's father, Jim Holt. [Doc. No. 69-1, p. 35]

///

## A. Outstanding Restitution from prior Criminal Conviction

On January 11, 2013, the Court held a second telephonic SDC. [Doc. No. 60] According to defense counsel, prior to the teleconference with the Court, he and plaintiff had a telephone conversation regarding restitution owed by plaintiff for a prior criminal conviction. [Doc. No. 69-1, (Declaration of Martin Kosla), p. 3] During the teleconference with the Court, the parties requested an additional 6 weeks to resolve any restitution-related issues. *Id.* Good cause appearing, the Court set a further telephonic SDC for March 1, 2013. [Doc. No. 60]

In a letter to plaintiff dated January 25, 2013, defense counsel memorialized his January 11, 2013 telephone conversation with plaintiff, and raised some of defense counsel's independent findings regarding plaintiff's outstanding restitution obligations. [Doc. No. 69-1, p. 37]   Defense counsel stated that during the January 11, 2013 conversation, plaintiff "stated that [he has] paid off all of [his] restitution." *Id.* In this January 25, 2013 letter, defense counsel explained that, according to CDCR, "while [plaintiff] paid off [his] restitution with respect to [his] current conviction, [he has] not done so with respect to [his] previous conviction. The restitution for the earlier conviction exceeds the amount of the settlement, which means that no proceeds will be sent to [plaintiff's] father." Thus, defense counsel advised plaintiff, "If you believe that all of your restitution has been paid off, then please provide us with the necessary documentation that supports this. We will need to revise the settlement agreement to reflect the above matters." *Id.* (emphasis in original).   There is no indication that plaintiff furnished any documentation establishing that all of his restitution obligations, including those related to his prior conviction, have been paid in full.

In a letter to plaintiff dated February 28, 2013, defense counsel memorialized a "recent" telephone call with plaintiff regarding settlement and restitution. [Doc. No. 69-1, p. 39] Defense counsel attached a revised Settlement Agreement with "language which addresses the restitution issue." *Id.* Defense counsel asked plaintiff to sign and return the revised agreement. *Id.* This constituted the third draft of the Agreement.

This version of the Agreement deviated from the second in that it re-incorporated the statutory language regarding the mandatory payment of any outstanding restitution. In pertinent part, it provided: "Pursuant to [California] Penal Code Section 208.5, CDCR is obligated to collect any amounts owed by a prisoner under a restitution fine or order, including any administrative fees related to such amounts. Such amount and fees will be deducted from the settlement amount and paid on plaintiff's behalf pursuant to Penal Code Section 2085.5. If the settlement amount exceeds the restitution amounts and fees, the excess balance shall be made by check to plaintiff's inmate trust account." [Doc. No. 69-1, p. 41, ¶ 2] However, the third draft of the Agreement made no mention of the funds being distributed to plaintiff's father, Jim Holt.

On March 1, 2013, the Court held a third telephonic SDC. [Doc. No. 62] During the teleconference with the Court, the parties represented that "while the restitution issued has been resolved, additional time is needed to finalize the settlement agreement and for the funds to be deposited into plaintiff's trust account." *Id.* Good cause appearing, the Court set a further telephonic SDC for May 10, 2013 and encouraged the parties to expedite the payment process to the extent possible. *Id.*

Because plaintiff had yet to sign the third draft of the Settlement Agreement, defense counsel executed a follow-up letter to plaintiff dated April 5, 2013 which repeated the substance of his letter dated February 28, 2013 seeking plaintiff's signature on the revised Agreement. [Doc. No. 69-1, p. 45] *cf.* [Doc. No. 69-1, p. 39]

On May 10, 2013, the Court held a fourth telephonic SDC. [Doc. No. 63] The parties represented that they may have reached an impasse regarding the Settlement Agreement. *Id.* Further, plaintiff advised the Court that he intended to seek counsel to evaluate the proposed Agreement. *Id.* To allow plaintiff the opportunity to seek counsel, the Court set a telephonic Status Conference so that the parties and the Court could discuss more fully the issues related to the alleged impasse in finalizing the settlement documentation. On May 23, 2013, the Court held a telephonic Status Conference where the parties were able to more fully articulate the issues. [Doc. No.

64] As a result of that teleconference, and to allow plaintiff more time to seek counsel, the Court set a further telephonic Status Conference for June 25, 2013 and ordered defense counsel, at plaintiff's request, to provide plaintiff with a copy of the operative Complaint in this action. *Id.* Further, the Court ordered defense counsel to make reasonable inquiries into locating plaintiff's allegedly lost legal documents, and to submit a report to the Court detailing and documenting the allegedly outstanding restitution related to plaintiff's prior conviction. *Id.* Nothing in the record or subsequent conversations with plaintiff indicates that he sought or retained counsel to review the Agreement.

On June 21, 2013, defense counsel submitted a Status Report regarding plaintiff's "missing" property and outstanding restitution. [Doc. No. 65] With respect to the property, defendants ascertained that plaintiff had a total of 9 boxes of personal property prior to his transfer from Chuckawalla Valley State Prison to Valley State Prison ("VSP"). However, 3 of the 9 boxes contained "disapproved property" not suitable for transport. Plaintiff elected to mail the 3 boxes, at his own expense, to his father, Jim Holt. According to the "Mail-out Slips," the remaining 6 boxes were sent to VSP. Further, according to the "Property Transfer Receipt" forms, all 6 boxes that were sent to VSP were received by plaintiff. Thus, defense counsel concluded that none of plaintiff's property went missing during transfer because 6 of his 9 boxes were received by him, and the remaining 3 were sent by plaintiff to his father. Defense counsel's conclusion is substantiated by the attached "Mail-out Slips" and "Property Transfer Receipt" forms. [Doc. No. 65, Exhs. D-F]

With respect to the outstanding restitution, defendants partially confirmed plaintiff's contention, finding that the restitution obligation for plaintiff's current conviction (Ventura County Court Case No. 200010277) and incarceration (CDCR No. T80759) was fulfilled. To corroborate this, defense counsel provided a "Restitution Search" printout from VSP. [Doc. No. 65, Exh. A] However, restitution owed for plaintiff's prior conviction (Ventura County Court Case No. CR28973) and

incarceration (CDCR No. H36816) remains unfulfilled, with plaintiff still owing $724.59. To corroborate this, defense counsel provided true and correct copies of "Restitution Search" and "Restitution History" printouts from VSP. [Doc. No. 65, Exh. B] The outstanding restitution is for a conviction that is over 20 years old.

On June 27, 2013, the Court held another telephonic Status Conference. [Doc. No. 67] Defense counsel indicated that he intended to file a Motion to Enforce the Settlement. Plaintiff stated that he did not agree to the terms of the Settlement. The Court set a briefing schedule on the Motion to Enforcement Settlement [Doc. No. 69], and the parties fully briefed the issue [Doc. Nos. 69, 70, 72, 74]. Accordingly, it is now ready for disposition by this Court.

**B. Motion to Enforce Settlement, Opposition, Reply, and Letter to Court**

Defendants contend that a Settlement was reached in this case on August 27, 2012 when defense counsel and plaintiff appeared at a telephonic Settlement Conference with Magistrate Judge Karen S. Crawford. At the conclusion of that teleconference, plaintiff verbally agreed to dismiss the case against all defendants in exchange for the sum of $450. Defendants describe the Agreement as being clear and complete. Further, they argue that plaintiff personally agreed to the terms of the Settlement after actively participating in the telephonic conference, and later signed the first draft of the written Agreement. Defendants speculate that plaintiff "is attempting to back out of the settlement because he found out that he owes restitution from an earlier conviction that will have to be paid out of the settlement proceeds." [Doc. No. 69, p. 3]

Plaintiff claims that a binding Settlement was never reached. Although the argument is not well-developed, plaintiff appears to contend that his act of signing and returning the first draft of the written Settlement Agreement on September 29, 2012 constituted a mere "offer" from plaintiff. He further argues defendants never accepted this offer because they never returned the signed first draft of the Agreement. Plaintiff asserts that he later revoked his September 29, 2012 offer on or about May 15, 2013,

prior to any communicated acceptance by defendants to plaintiff. [Doc. No. 70, p. 4] Furthermore, plaintiff argues that defense counsel "repudiated" the offer by sending "two longer and substantially different proposals without ever communicating acceptance of the First Proposal executed by Plaintiff." [Doc. No. 70, p. 5]

Plaintiff dismisses as "completely false" defense counsel's argument that plaintiff withdrew from the Settlement only after learning about his outstanding restitution obligation from a prior conviction. [Doc. No. 70, p. 6] Rather, plaintiff explains that in the "almost ten months that Defendants' counsel delayed in accepting and performing the proposed agreement, Plaintiff's medical condition worsened." [Doc. No. 70, p. 6] Plaintiff contends that it was this degeneration in his medical condition, not the outstanding restitution, that drove him to withdraw from the Agreement.

Plaintiff acknowledges that at the time he orally agreed and also signed and mailed the first draft of the written Agreement, "he did not believe that he owed any restitution." *Id.* Plaintiff's belief was based on representations made by CDCR, specifically monthly account statements provided to plaintiff by CDCR. *Id.* According to plaintiff, "[F]or every month of the last eight years, [he] has received a statement indicating that he does not owe any further restitution and that restitution is fulfilled. Furthermore, the CDCR ceased deducting its customary 55% from [his] earnings while in prison to apply to restitution." [Doc. No. 70, p. 7, fn 4] Plaintiff provides an "Inmate Statement Report" (under CDCR #T80759) demonstrating that his restitution obligations under Court Case # 200010277 were fulfilled. [Doc. No. 70, p. 14, Exh. B]

## II.  LEGAL STANDARD

A District Court has the inherent power to enforce a settlement agreement entered into while the litigation is pending before it. *In re City of Equities Anaheim, Ltd.*, 22 F.3d 954, 957 (9th Cir. 1995); *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987). This enforcement power extends to oral agreements. *Doi v. Halekulnai Corp.*, 276 F.3d 1131, 1138 (9th Cir. 2002). Further, a magistrate judge's recollection of the

terms of an oral agreement are sufficient for purposes of enforcing the agreement. *See Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487, 489-490 (7th Cir. 2002). However, settlement agreements cannot be enforced where no agreement exists. *United States v. Ward Baking Co.*, 376 U.S. 327, 334 (1964). The moving party has the burden of demonstrating that the parties formed a legally enforceable settlement agreement. *See Olam v. Congress Mortg. Co.*, 68 F. Supp. 2d 1110, 1137 n. 19, 1140 (N.D. Cal. 1999).

Under federal law, there are two requirements for an oral agreement to be enforceable. First, the agreement must be complete. *Maynard v. City of San Jose*, 37 F.3d 1396, 1401 (9th Cir. 1994); *Callie*, 829 F.2d at 890. Second, both parties must have directly agreed to be bound by the terms of the settlement, or have authorized their respective representatives to settle the dispute. *Harrop v. Western Airlines, Inc.*, 550 F.2d 1143, 1144-45 (9th Cir. 1977). In addition to the federal standards articulated above, the "construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th 1989). Therefore, even though the underlying cause of action presented in this litigation is based upon a federal statute, this Court applies California law regarding the formation and interpretation of contracts in determining whether a legally enforceable Settlement Agreement was reached. *United Commercial Ins. Serv. v. Paymaster Corp.*, 962 F.2d 853, 857 (9th Cir. 1992); *see also Harrop*, 550 F.2d at 1145 (applying California law).

Under California law, contract formation requires (1) parties capable of contracting; (2) the parties' consent; (3) a lawful object; and, (4) sufficient cause or consideration. *Lopez v. Charles Schwab & Co.*, 118 Cal. App. 4th 1224, 1230 (2004) (citing CAL. CIV. CODE § 1550). Because the facts of this case do not bring into question the issues of capacity, lawfulness, or the sufficiency of consideration, this Court will focus squarely on the parties' consent, or the element of mutual assent. "Mutual assent usually is manifested by an offer communicated to the offeree and an acceptance communicated to the offeror." *Lopez*, 118 Cal. App. 4th at 1230 (citing

CAL. CIV. CODE §§ 1550, 1565).  The existence of mutual consent is determined by objective criteria; the "parties' outward manifestations must show that the parties all agreed upon the same thing in the same sense." *Weddington Prod., Inc., v. Flick*, 60 Cal. 4th 793, 811 (1998).

With respect to interpreting the terms of a contract, the primary goal of contract interpretation is to give effect to the mutual intention of the parties. *See Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992).  The parties' mutual intent is determined by examining a number of factors, including: (1) the words used in the written agreement; (2) the surrounding circumstances under which the parties negotiated or entered into the contract; and, (3) the subsequent conduct of the parties. *See Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998); *Hernandez v. Badger Construction Equipment Co.*, 28 Cal. App. 4th 1791, 1814 (1994).

### III.  DISCUSSION

Defendants have carried their burden of demonstrating that the parties formed a legally enforceable settlement agreement. Based upon its involvement in the actual Settlement Conference, this Court finds that the parties reached a binding oral Agreement with the expectation that a written agreement would follow. Specifically, on August 27, 2012, during a telephonic Mandatory Settlement Conference before the undersigned Magistrate Judge, the parties agreed that in exchange for plaintiff dismissing all claims, defendants would pay plaintiff $450.  At the conclusion of the August 27, 2012 MSC, the Court ordered defense counsel to prepare drafts of both the Settlement Agreement and a Joint Motion for Dismissal. [Doc. No. 58] The Settlement was thereafter noted in a Minute Order issued by the Court.  *Id.*

### A.  Contract Formation

In instances where parties initially reach an oral agreement with the expectation that a written agreement would follow,

> two possibilities exist: Negotiations can result in a binding oral contract when all of the terms are definitely understood, even though the parties intend to later execute a formal writing. Alternatively, where the parties understood that the proposed agreement is not complete until reduced to a formal writing and

signed, no binding contract results until this is done.

*Khajavi v. Feather River Anesthesia Medical Group*, 84 Cal. App. 4th 32, 62 (2000). As to the first possibility, "if the respective parties orally agreed upon all of the terms and conditions of a proposed written agreement with the mutual intention that the oral agreement should thereupon become binding, the mere fact that a formal written agreement to the same effect has not yet been signed does not alter the binding validity of the oral agreement." *Banner Entertainment, Inc. v. Superior Court*, 62 Cal. App. 4th 348, 358 (1998). The test of whether there is an enforceable oral agreement is:

> did the minds of the parties meet; that a proposal for a contract was made by one party and accepted by another; that the parties definitely understood and agreed upon the terms of the contract; and finally, that as part of the mutual understanding it was agreed that a written contract embodying the terms agreed upon should be prepared and executed by the respective parties. Under such circumstances, neither party is at liberty to refuse to perform.

*Kreling v. Walsh*, 77 Cal. App. 2d 821, 834-35 (1947). "Whether the parties intended only to be bound upon the execution of a written, signed agreement is a factual issue." *Callie*, 829 F.2d at 890-91. "Where material facts concerning the existence or terms of an agreement to settle are in dispute, the Court must conduct an evidentiary hearing, if requested." *Roundtree v. Adams*, 2009 WL 790038 *5 (citing *Callie*, 829 F.2d at 891).

In this instance, an evidentiary hearing is not necessary because no material facts are at issue. Based upon the undersigned Magistrate Judge's participation in the underlying telephonic Mandatory Settlement Conference, there is no question that the parties mutually assented to be bound by the relatively few and simple terms of the oral Agreement reached during the teleconference with the Court on August 27, 2012. Plaintiff partially acknowledges the same in his August 19, 2013 Opposition to the Motion presently before the Court when he states: "Plaintiff agreed that he would dismiss his claim[s] upon the payment to his elderly father of $450." [Doc. No. 70, p. 6] Given plaintiff's admission, and this Court's involvement in the actual teleconference where agreement was reached, the Court finds that a binding oral contract was formed on August 27, 2012. The parties definitely understood and agreed

1  upon the straightforward terms, specifically plaintiff's dismissal of the entire lawsuit
2  in exchange for $450. Further, at the end of the teleconference, and based upon an
3  order of the Court directing defense counsel to draft *both* the Agreement and a Joint
4  Motion to Dismiss, there was a mutual understanding that the written contract would
5  simply embody these terms, as there remained no additional terms or issues to discuss.

6  Therefore, plaintiff's characterization of his signing and returning of the first
7  written draft of the Settlement Agreement on September 29, 2012 as the first legal
8  settlement "offer" fails. Such a characterization disregards the binding oral Agreement
9  reached during the August 27, 2012 teleconference with the Court, and ignores that
10 defendants prepared the draft of the Settlement Agreement signed by plaintiff as
11 ordered to confirm in writing what had already been agreed upon. Because this Court
12 rejects the argument that the signing of the initial draft documents constituted the first
13 "offer," plaintiff's arguments that he revoked this "offer," or that defendants repudiated
14 this "offer" by sending additional revised drafts of the same are without merit. Further,
15 plaintiff's characterization of the second and third drafts of the written Agreement as
16 being "longer and substantially different proposals" is unsupported by the facts. [Doc.
17 No. 70, p. 5] Each of the three versions of the written Agreement were between 3 and
18 4 pages and contained between 6 and 10 paragraphs. The revisions made were
19 administrative in nature and involved only plaintiff's outstanding restitution
20 obligations and the mechanism for facilitating payment, if any, to plaintiff's father
21 instead of to plaintiff directly. The Court considers them to be immaterial
22 administrative adjustments, as these terms are statutorily controlled by California law,
23 and thus outside of the control of parties and not subject to negotiation. As explained
24 in greater detail below, they did not impact the material terms of the agreement.

25 **B. Defenses to Enforcement**

26 Despite essentially conceding to the contrary, plaintiff raises arguments in his
27 Opposition attacking contract formation. Although the arguments are not well-
28 developed, given plaintiff's *pro se* status, this Court will consider the issues raised by

plaintiff more appropriately as contract defenses or excuses.

### 1. Rescission by Mistake

Although plaintiff dismisses as "completely false" defense counsel's argument that plaintiff attempted to withdraw from the settlement only after learning about his outstanding restitution obligation from a prior conviction, plaintiff acknowledges that at the time he entered into the Agreement on August 27, 2012, and further signed and mailed the first draft of the Agreement on September 29, 2012, "he did not believe that he owed any restitution." [Doc. No. 70, p. 6] Plaintiff's outstanding restitution for a more than 20-year-old conviction raises the defense of mistake.

Plaintiff asserts that his belief that all of his criminal restitution obligations were fulfilled was based on representations made by CDCR, as contained in monthly account statements provided to plaintiff by CDCR. *Id.* Plaintiff alleges that "for every month of the last eight years, [he] has received a statement indicating that he does not owe any further restitution and that restitution is fulfilled. Furthermore, CDCR ceased deducting its customary 55% from [his] earnings while in prison to apply to restitution." [Doc. No. 70, p. 7, fn 4] Plaintiff provided an "Inmate Statement Report" (CDCR #T80759) demonstrating that his restitution obligations under Court Case # 200010277 were fulfilled. [Doc. No. 70, p. 14, Exh. B]

As part of his due diligence while drafting the Settlement Agreement, defense counsel inquired with CDCR headquarters in Sacramento, California regarding plaintiff's outstanding restitution obligations.[2] It was during this process in January 2013, after the Settlement had been reached, that the issue of plaintiff's outstanding restitution arose. [Doc. No. 60] The parties brought the issue to the attention of the Court, and on May 23, 2013, this Court ordered defense counsel to provide the Court with more concrete numbers and documentation of plaintiff's outstanding restitution. [Doc. No. 64] On June 21, 2013, defense counsel submitted a Status Report regarding

---

[2] Although not contained in any declarations or the moving papers, defense counsel explained these efforts to the Court during a telephonic Status Conference on May 23, 2013. [Doc. No. 64]

plaintiff's outstanding restitution. [Doc. No. 65] Defendants confirmed plaintiff's contention that the restitution for his *current* conviction (Ventura County Court Case No. 200010277) and incarceration (CDCR No. T80759) had been fulfilled. [Doc. No. 65, Exh. A] However, restitution owed for plaintiff's *previous* conviction (Ventura County Court Case No. CR28973) and incarceration (CDCR No. H36816) has not been fulfilled, with plaintiff still owing $724.59. [Doc. No. 65, Exh. B]

In California, rescission by mistake is governed by statute. California Civil Code § 1689(b)(1) states in part that a "party to a contract may rescind the contract . . . [i]f the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake." CAL. CIV. CODE § 1689(b)(1). A mistake of fact is not "the neglect of a legal duty on the part of a person making the mistake," but consists of "[a]n unconscious ignorance or forgetfulness of a fact past or present, material to the contract" or "[b]elief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed." CAL. CIV. CODE § 1577. A party seeking rescission must also show "that it would suffer material harm if the agreement were enforced, though that need not be a pecuniary loss." *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1332-33 (Cal. Ct. App. 2009).

A factual mistake by one party, or unilateral mistake, provides grounds for rescission in certain limited circumstances.[3] California law does not adhere to the original Restatement's requirements "for rescission based upon unilateral mistake–i.e., only in circumstances where the other party knew of the mistake or caused the mistake." *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 281 (2001). Rather, the California Supreme Court in *Donovan* found the Restatement (Second) of Contracts to be

---

[3] This Court will analyze any mistake of fact as a unilateral one, not mutual. Although all parties to the Settlement Agreement may have been both equally unaware of plaintiff's outstanding restitution obligation, as explained in greater detail below, plaintiff's restitution situation was not a basic assumption upon which both parties relied in entering in the Agreement. In fact, where or how the $450 settlement amount would be remitted to plaintiff has no impact on defendants' obligations under the Agreement.

1   consistent with its prior decisions in *M.F. Kemper Const. Co. v. City of Los Angeles*,
2   37 Cal. 2d 696 (1951) and *Elsinore Union Elementary Sch. Dist. of Riverside Cnty. v.*
3   *Kastorff*, 54 Cal. 2d 380 (1960), and adopted § 153 of the Second Restatement as
4   California law. *Donovan*, 26 Cal. 4th at 281 (adopting Rest. 2d Contacts, § 153).

5   Section 153 of the Restatement (Second) of Contracts states: "Where a mistake
6   of one party at the time a contract was made as to a basic assumption on which he made
7   the contract has a material effect on the agreed exchange of performances that is
8   adverse to him, the contract is voidable by him if he does not bear the risk of the
9   mistake under the rule stated in § 154, and (a) the effect of the mistake is such that
10  enforcement of the contract would be unconscionable, or (b) the other party has reason
11  to know of the mistake or his fault caused the mistake."  Rest. 2d Contacts, § 153.
12  Here, there are no facts to indicate that defendants knew or had reason to know about
13  plaintiff's outstanding restitution obligations prior to formation of the Agreement on
14  August 27, 2012.  "Where the [defendants have] no reason to know of and [do] not
15  cause the [plaintiff's] unilateral mistake of fact, the [plaintiff] must establish the
16  following facts to obtain rescission of the contract: (1) the [plaintiff] made a mistake
17  regarding a basic assumption upon which the [plaintiff] made the contract; (2) the
18  mistake has a material effect upon the agreed exchange of performances that is adverse
19  to the [plaintiff]; (3) the [plaintiff] does not bear the risk of the mistake; and (4) the
20  effect of the mistake is such that enforcement of the contract would be
21  unconscionable."  *Donovan*, 26 Cal. 4th at 282.

22  Plaintiff is unable to establish that the mistake at issue was a basic assumption
23  upon which he entered the Agreement, or that it materially impacts the exchange of
24  performances in a manner adverse to him. To establish such, plaintiff "must show that
25  the resulting imbalance in the agreed exchange is so severe that it would be unfair to
26  require [plaintiff] to perform." *Donovan*, 26 Cal. 4th at 282 (citing Rest. 2d Contracts,
27  § 152, com. C, p. 388). Ordinarily, a party can satisfy this requirement by showing that
28  the exchange is not only less desirable for them, but is also more advantageous to the

1   other party. Rest. 2d Contracts, § 152, com. C, p. 388. Measured against this standard,

2   plaintiff's mistake fails to satisfy. Although it "need not be a pecuniary loss" to be

3   material, the restitution-related mistake is immaterial because it is one of form rather

4   than substance, and because the statutory scheme demanding priority payment of

5   restitution obligations is outside of the control of the negotiating parties.

6       According to the terms of the Settlement, defendants agreed to pay $450 to

7   plaintiff in exchange for plaintiff's dismissal of his civil rights lawsuit. In weighing

8   the risks and expenses associated with continued litigation and the burdens he faced

9   in proving his case at trial, and after arms-length negotiations with opposing counsel

10   in the presence of the undersigned Magistrate Judge, plaintiff agreed to accept $450 to

11   settle this case. While plaintiff anticipated the $450 being deposited directly with his

12   father, by statute, plaintiff's previously unknown restitution obligation takes priority.

13   Given the fungibility of money, however, plaintiff still benefits because until his

14   outstanding restitution is paid in full, he will continue to carry the debt and all assets

15   earned will be levied accordingly. While the benefit may now seem less desirable to

16   plaintiff, he cannot avoid his statutory obligations by paying the settlement funds

17   directly to his father. Further, his mistake does not impact defendants' performance in

18   any way, and defendants do not achieve any sort of tactical advantage as a result. They

19   agreed to pay $450 to settle the case. Whether it goes to plaintiff's father directly, to

20   plaintiff directly, or towards plaintiff's restitution obligation is irrelevant. Where the

21   money is remitted is statutorily controlled and not subject to negotiation.

22       For all of these reasons, this Court finds that payment to plaintiff's father was

23   not a basic assumption upon which plaintiff made this Agreement, and further, that the

24   plaintiff's mistake, if any, did not have a material adverse effect upon the agreed

25   exchange of performances for plaintiff. Plaintiff was willing to settle this matter for

26   $450. The application of the $450 settlement sum towards plaintiff's roughly $725 in

27   outstanding restitution still benefits plaintiff, albeit in a manner different than plaintiff

28   planned or anticipated. Given that plaintiff is still benefitted by the terms of the

Settlement Agreement, and that this mistake does not advantage defendants in any way, this Court finds that plaintiff has failed to demonstrate that the resulting imbalance is so severe that it would be unfair to require him to perform his obligations under the Agreement.

This Court also finds that plaintiff bears the burden of this mistake. California has adopted and applies the Restatement (Second) of Contracts § 154 to determine the allocation of risk in instances of mistake. *Donovan*, 26 Cal. 4th at 283. Section 154 provides that: "A party bears the risk of mistake when:

    (a)    the risk is allocated to him by agreement of the parties, or

    (b)    he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

    (c)    the risk is allocated to him by the court on ground that it is reasonable in the circumstances to do so."

Restatement (Second) of Contracts § 154. Given that the Agreement did not allocate the risk of mistake to plaintiff, and that plaintiff was not consciously ignorant, this Court will utilize a reasonableness analysis in allocating the restitution-related mistake.

This Court finds that, at the time the Agreement was made, plaintiff genuinely believed that his restitution obligations were fulfilled. A mistake of fact is not "the neglect of a legal duty on the part of a person making the mistake," but consists of "[a]n unconscious ignorance or forgetfulness of a fact past or present, material to the contract." CAL. CIV. CODE § 1577. Given that both convictions were registered with CDCR, that plaintiff received months of statements from CDCR indicating that the restitution for his current conviction was fulfilled, and that CDCR ceased deducting restitution from his prison trust account, the Court finds plaintiff was unconsciously ignorant or forgetful regarding his outstanding obligation. However, for the reasons articulated above, the fact was not material to the contract. Further, the genuineness of plaintiff's mistake does not shift the risk of that mistake to defendants. To the contrary, plaintiff has first hand knowledge of his own criminal history and is on constructive notice that he was assigned different case and incarceration numbers for

his current and prior convictions. Although plaintiff is currently incarcerated and prosecuting this law suit *pro se*, he still has reasonable access to CDCR to ascertain outstanding restitution obligations attached to his name. As the party who initiated this action, plaintiff bears the burden of prosecuting the lawsuit. Defendants' inquiry into plaintiff's restitution obligations does not serve to shift plaintiff's burden to defendants; nor does it alleviate plaintiff of his obligations under § 154.

The final factor plaintiff must establish to obtain rescission based upon mistake is to demonstrate that enforcement of the Settlement Agreement would be unconscionable. "An unconscionable contract ordinarily involves both a procedural and substantive element: (1) oppression or surprise due to unequal bargaining power, and (2) overly harsh or one-sided results." *Donovan*, 26 Cal. 4th at 291 (citing *Armendariz v. Foundation Health Psychcare Servs., Inc*. 24 Cal. 4th 83, 114 (2000)). With respect to the procedural prong, despite plaintiff's *pro se* and incarcerated status, this Court finds there was no oppression or surprise due to unequal bargaining power. To the contrary, the undersigned Magistrate Judge was present during both telephonic Mandatory Settlement Conferences (held on June 28, 2012 and August 27, 2012, respectively) and finds that the Settlement Agreement was reached on August 27, 2012 following serious, informed, arms-length negotiations.

As to the substantive prong, courts assess whether a unilateral mistake leads to "overly harsh or one-sided results entitling [the mistaken party] to rescission." *Donovan*, 26 Cal. 4th at 292. California courts typically find substantive unconscionability in the context of mistaken advertisements or construction bids where it would be "unjust and unfair to permit [one party] to take advantage of [the other party's] mistake." *Kemper*, 37 Cal. 2d at 702-03. The facts of the instant action before this Court are not analogous to other instances of substantive unconscionability found by California courts. In other contexts, contracts have been rescinded for mistakes leading to errors ranging from approximately 7 to 32 percent of the intended contract price on grounds that it would overly harsh or one-sided. *Elsinore*, 54 Cal. 2d at 389;

*Donovan*, 26 Cal. 4th at 293. Here, however, plaintiff is receiving the same bargained-for amount of benefit, namely $450. The only impact of plaintiff's mistake is that the $450 will be credited towards his outstanding criminal restitution and not deposited into his prison trust account or with his father. Under these circumstances, this Court finds that plaintiff's mistaken belief regarding his outstanding restitution obligation is not "unjust and fair" and does not permit defendants, who are still obligated to pay the same amount, to take advantage of plaintiff's mistake.

For all of these reasons, any argument by plaintiff seeking rescission of the contract based on mistake of fact **should be DENIED**.

### 2. Unconscionability

Plaintiff explains that in the "almost ten months that Defendants' counsel delayed in accepting and performing the proposed agreement, Plaintiff's medical condition worsened." [Doc. No. 70, p. 6] Plaintiff contends that it was this degeneration in his medical condition, not the outstanding restitution, that drove him to withdraw from the Agreement. According to California Civil Code § 1670.5(a), a court may refuse to enforce a contract if it finds, as a matter of law, that whole or part of the contract is unconscionable at the time it was made. CAL. CIV. CODE § 1670.5(a). Plaintiff's argument regarding the degeneration of his medical condition raises the issue of unconscionability. However, for the reasons discussed in greater detail below, this Court will not refuse to enforce the Settlement Agreement on this ground.

As discussed in the mistake section above, unconscionability has both procedural and substantive elements. *Zullo v. Superior Court*, 197 Cal. App. 4th 477, 484 (2011). "'The procedural element focuses on two factors: "oppression" and "surprise." [Citations] "Oppression" arises from an inequality of bargaining power which results in no real negotiations and "an absence of meaningful choice." [Citations] "Surprise" involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1532 (1997) (quoting *A&M*

1   *Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486 (1982)). Substantive

2   unconscionability refers to "overly harsh or unjustifiable one-side results." *Zullo*, 197

3   Cal. App. 4th at 484. Because a contract is "largely an allocation of risks between the

4   parties," a contract term is "substantively suspect if, viewed at the time the contract was

5   formed, it allocates the risks in an unreasonable or unexpected manner." *Id.* While

6   both forms of unconscionability must be present in order to invalidate a contract, "they

7   need not be present in equal parts" and will be measured on a sliding scale. *Id.*

8       As discussed above, this Court finds no procedural unconscionability in the

9   negotiation of the Settlement Agreement. Despite plaintiff's incarcerated and *pro per*

10  status, plaintiff initiated this action and was conferred the benefit of Court involvement

11  during two telephonic Mandatory Settlement Conferences which ultimately led to the

12  Agreement between the parties. The Agreement was not adhesive and there was no

13  absence of meaningful choice because plaintiff had other options, specifically

14  proceeding with the litigation against defendants or demanding a higher settlement

15  amount. With the undersigned Magistrate Judge serving as a neutral during these

16  discussions, there were no elements of oppression or surprise during the settlement

17  negotiations.

18      As to substantive unconscionability, the Agreement reached is not one-sided or

19  harsh. At the time the Agreement was formed, both parties were aware of plaintiff's

20  underlying claims. Specifically, plaintiff alleged that the named defendants improperly

21  "den[ied] him effective pain medication for his [back] pain" and improperly "refus[ed]

22  to give him the surgery needed to correct [the] problem." [Doc. No. 22, p. 5] This was

23  the gravity of plaintiff's relatively straightforward suit. "[A] contract is largely an

24  allocation of risks between the parties." *Zullo*, 197 Cal. App. 4th at 484. Here, both

25  parties faced the risk, expense, and uncertainty associated with continued litigation.

26  Taking these risks into consideration, plaintiff and defendants mutually agreed to settle

27  the action for $450. More specifically, in exchange for plaintiff's dismissal of all

28  claims, defendants agreed to pay $450 to plaintiff. The Agreement is not one-sided or

overly harsh. Treatment for plaintiff's back pain constituted the driving force behind this litigation. Accordingly, the degeneration of plaintiff's condition was squarely within the risk plaintiff assumed in choosing to settle. Any buyer's remorse experienced by plaintiff does not rise to the level of unconscionability. *Tabarez v. Butler*, 2011 WL 2681222 *5 (E.D. Cal. July 8, 2011) (unpublished).

Under California Civil Code § 1670.5, a Court may refuse to enforce all or part of an agreement due to unconscionability. For the reasons discussed above, this Court finds that the Settlement Agreement was not unconscionable, either in whole or in part. Therefore, the Court will not refuse to enforce the Agreement on this ground, and any argument by plaintiff seeking such **should be DENIED**.[4]

### IV. CONCLUSION

Based on the moving and opposing papers surrounding defendants' Motion to Enforce Settlement Agreement [Doc. Nos. 69, 70, 72, 74], as well as the undersigned's involvement in the two telephonic Mandatory Settlement Conferences held in this action [Doc. Nos. 54, 58], this Court finds that plaintiff and defendants formed a legally binding Settlement Agreement at the August 27, 2012 Settlement Conference, and that plaintiff understood the nature of the Settlement Agreement and appreciated its probable consequences. Plaintiff's Opposition to defendants' Motion to Enforce appears to be based on a case of buyer's remorse, which is not grounds for overturning the Agreement reached on August 27, 2012.

Accordingly, for the reasons outlined in greater detail above, the Court **RECOMMENDS** that defendants' Motion to Enforce Settlement [Doc. No. 69] be **GRANTED**. This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

---

[4] Nothing in this Report and Recommendation precludes or prevents plaintiff from presenting to the health care professionals at his correctional institution for further medical treatment of his condition should it remain the same, change, or worsen.

11cv1502-GPC(KSC)

**IT IS ORDERED** that no later than <u>**30 days from issuance of this Order**</u>, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation to Grant Dismissal."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than <u>**ten days after being served with the objections**</u>.   The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Date: December _____17_____, 2013

KAREN S. CRAWFORD
United States Magistrate Judge

11cv1502-GPC(KSC)